ERWIN W. EBERT ET AL., APPELLANTS, V. ANNA M. EBERT ET AL., APPELLEES.

FILED DECEMBER 16, 1931. No. 27916.

*Good, Good & Kirkpatrick* and *E. S. Schiefelbein,* for appellants.

*Max V. Beghtol* and *Woodruff & Gard, contra.*

Heard before GOSS, C. J., EBERLY, DEAN and PAINE, JJ., and REDICK, District Judge.

REDICK, District Judge.

Action in equity to set aside two deeds executed by Henry P. Ebert to his second wife, Anna M. Ebert, conveying a house and lot in Lincoln and a farm of 160 acres in Dawson county. Plaintiffs Erwin W. and Arley S. Ebert and Oral M. Berlin (nee Ebert), children of grantor, claim that the deeds were executed at a time when their father was mentally incompetent and were procured by undue influence of the defendant and upon her promise that after grantor's death she would hold the real estate in trust for the appellants as heirs at law of the deceased, thereby raising a constructive or resulting trust in favor of the plaintiffs. These claims were put in issue by the answer; the case was tried in the lower court, and resulted in a decree generally against plaintiffs and for de-

fendant, but upon condition that defendant quitclaim to plaintiffs all interest or claim she might have to certain property in Saunders county, Nebraska, being all the remaining property belonging to the deceased, consisting of a two-sixths interest in a 200-acre farm, and a like interest in a house and lot in Wahoo, and a claim against the farm in the sum of $5,000. Plaintiffs appeal to this court.

For a clear understanding of the questions submitted, it is necessary that we state the situation of the parties at and before the execution of the deeds in question. Henry P. Ebert was a farmer and lived with his first wife on the 200-acre farm in Saunders county, which came to her by inheritance, and which, upon her death, descended to the three children and Henry, her surviving spouse, Henry's interest being an undivided two-sixths; he also had two claims for improvements on the property duly allowed by the probate court in the sum of $5,000; he also owned a house and lot in Wahoo; he was also the owner of personal property and farm machinery which was afterwards purchased by his son Erwin for the sum of $1,200 for which he gave his note; also an improved farm of 160 acres in Dawson county, and a five-room frame house and lot in Lincoln (the property in controversy); also personal property consisting of building and loan stock in the sum of $3,100, and note of a relative for $3,500.

Defendant Anna M. Ebert was a widow living in Kansas City, Kansas, where she owned a house and lot which had been the family homestead, and where she conducted a boarding-house and took care of her father, who lived with her; she also owned another small house and lot in Kansas City, Kansas; the value of these properties is not disclosed by the evidence but they were incumbered to the extent hereinafter stated. She had taught school for twelve years.

Some time in 1926 Henry P. Ebert met the defendant, then Mrs. Jones, on a visit to his sister, who was working for the defendant in the boarding-house, and this ac-

quaintance ripened into a friendship and correspondence between them, and in the spring of 1926 Henry went to Denver to meet the defendant, who was there on a vacation, remaining about one week. He visited defendant again at her home and proposed marriage, but defendant refused on the ground that she had to take care of her invalid father. Finally, in January, 1927, Henry invited her to come to Saunders county, where his daughter Oral and his son Erwin were to be married. She accepted the invitation, the marriages took place, and afterwards, upon the same day, Henry and defendant were married and went to Kansas City, Kansas, to live at her house. At this time Henry was 58 and defendant 53; Oral was 27, Erwin 25, and Arley 19. Arley went to school in Chicago for three months, and then went to live with his father and defendant, and continued to do so until this suit was brought, paying his board and lodging and being taken care of by the defendant while ill after an operation, and at another time, for several months. The relations of the families were always pleasant and affectionate, as evidenced by visiting back and forth and by a number of letters in evidence. Henry made his wife an allowance of $50 a month until the fall of 1927 and for an indefinite period thereafter $100 a month, and in the summer of 1928 paid off a mortgage upon Mrs. Ebert's house in the sum of $1,100. He had no occupation, but helped run the boarding-house—washing dishes, going after groceries, and making himself generally useful.

In August, 1928, Henry became ill, and in the latter part of that month suffered an apoplectic stroke which resulted in partial paralysis of his right side and affected his speech; he was confined to his bed several weeks, being taken care of by his wife. On September 10 following he transferred to his wife the building and loan stock in the sum of $3,100, a note for $3,500, and Erwin's note for $1,200, this being all the personal property he then owned, having on September 4 previously given his wife a check for $257.34, his balance in the bank at Ithaca. The validity

of this transaction is not in question in this case, but is the subject of another lawsuit pending in the federal court. After his stroke the bank account was kept in the name of defendant.

Prior to October 12, 1928, Mrs. Ebert, at the request of her husband, as she claims, after writing Erwin for them and receiving no answer, procured two deeds from the bank at Ithaca containing the description of the Dawson county farm and the house and lot in Lincoln, and had deeds prepared from her husband to herself conveying those properties, and on that date procured the attendance of a notary (Craig) to witness the signature and take the acknowledgment of the deeds, but Henry said he was not ready to sign them and they were not then signed. On October 29 following another notary, Mr. Berry, was called by Mrs. Allen, who had prepared the deeds, at the request of Mrs. Ebert, and at that time the deeds in question were signed and acknowledgment taken and were recorded late in November.

After the first ten days Henry's health continued to im-. prove, with occasional set-backs, so that he was able to get around the house, and in the spring to be taken out riding, and during the summer to visit his children in Saunders county, until about a month before his death, which occurred November 28, 1929.

1. The evidence as to the mental condition of Henry at and about the time of the execution of the deeds is not sufficient in our opinion to establish incompetency. It consists of evidence by the three children that after his stroke he lost control not only of his motor faculties, but also of his emotional faculties; that he could not use his right arm, and when attempting to speak would burst out crying or laughing without any apparent reason other than his condition; and the testimony of Dr. Williams in answer to a hypothetical question, based upon the evidence of the witnesses, that the patient had impaired mental faculties and would not have normal powers of resistance, that one in the condition described would have "an involvement

of his intellect to a degree that is highly questionable and you would have to know the patient the moment he signed the document or made the transfer" to form an opinion of his competency at that particular time. He expressed no opinion as to Henry's competency when the deeds were signed. On the other hand, Dr. Barney, who attended the patient from the time of his seizure until his death, states that he did not observe any conditions of emotional disturbance until November of 1928, and that during all the time prior thereto he considered the defendant mentally sound and perfectly competent to transact business. Miss Showalter also fixes the crying spells as beginning the latter part of November, 1928. A number of nonexperts gave their opinions, of varying weight, to the effect that he was mentally sound. From a careful consideration of all the evidence upon this question, we have come to the conclusion above stated.

2. Upon the issues of undue influence and constructive trust, plaintiffs rely upon what is claimed to have been an unnatural disposition of Henry's property, and which is said to be the result of his mental weakness; threats of his wife, and promises made by her to distribute the property after his death according to the rules of intestacy. The evidence upon these questions is so interwoven that they may well be considered together. Arley testifies that in the summer of 1927, from an adjoining room, he overheard a conversation between Henry and his wife in which the latter suggested to Henry that his children were out of their affairs and they need not consider them, to which Henry replied, "Yes, but these children are the ones who have helped me all through my life to get what I have and I have denied them a good many privileges they could otherwise have. I don't feel we need to spend any more than the income on this and leave them the principal after we are through with it." At another time prior to the transfers, Arley testifies defendant said in his presence to Henry: "If you don't want me to have protection by giving me enough property as collateral to protect myself

you will have to turn it over to one of the kids or all of them and they will have to be responsible for your care." And again: "Well, if he feels that way about it I don't see how I can assume responsibility for his care." And Arley testified that in the spring of 1929, Henry said to defendant, "If you will just give me my property, or money, I will be glad to take care of myself," and defendant replied, "When you get all packed up and ready to go I will give you what you want." Miss Showalter testifield that she heard defendant tell Henry, in the spring of 1929, that, if he could think of any way to manage it, she was willing that he take the money he had given her and he could provide for himself in whatever way he wanted to; to which Henry replied, "No, no; I don't want to go away." There was also testimony by Mrs. Allen and the notary who acknowledged the deeds that at that time Henry said that he "didn't know why he had to do that to get protection." Mrs. Allen also testified that when she was asked to prepare the deeds defendant said, "It was to take care of him during his illness;" that she made some correction in one of the deeds after it was signed, defendant saying she "didn't want to go through all that again."

It is claimed by plaintiffs that the greater part of this testimony is undenied by the defendant. . She did, however, specifically deny making any threats that if he did not sign the deed he would have to leave home and she would not take care of him, or that he would have to go back to the children or to a hospital, or making such statement to Mrs. Allen. Defendant testified that Henry said about the deeds that "he wanted to get his affairs arranged so I could take care of it;" "I do not want Erwin to take care of my affairs. We can take care of our own." She also testified that there was never any talk of reconveyance to Henry or anybody else; he never said anything about the children having any interest after my death except as I should decide; "he knew I was friendly toward the children and wanted to treat them right." Miss Showalter testified that early in the fall, after Henry was

stricken, she overheard a conversation between Arley and Henry in which Arley said: "Well, Dad, it is all right with us, you give her what you think she ought to have and don't worry about us children. We will get along all right." Mrs. Allen testified that defendant told her that "the deeds were to take care of him during his illness." In December, 1928, the sum of $2,100 out of the building and loan stock was paid on a mortgage on the boarding-house property. The $3,500 note was paid October, 1929. Rent of the Dawson county farm for 1928 was $1,000, and was used up in his care; the 1929 rent was used to build a barn, pay interest, taxes and expenses, about $1,100. Arley testified that on March 13, 1929, at his father's request and dictation the following instrument was prepared by him:

"Will of H. P. Ebert

"To whom it may concern:

"To Anna M. Ebert, my wife, I bequeath all of my tangible property and my property in Lincoln, Nebraska. I want my property in Dawson county, Nebraska, to be distributed according to the state laws of Nebraska.

"Any equity I hold in the property in Saunders county, Nebraska, I bequeath to my three children.

"This may not be a legal document but I believe it just and right and trust all parties concerned will respect my wish.

"(Signed) H. P. Ebert."

This instrument was put in a sealed envelope and placed in the bank and defendant had no knowledge of it until after Henry's death. Of course, it could not affect the deeds previously signed, if they were valid, but merely expressed Henry's state of mind when executed. Shortly after administration proceedings were started, February, 1930, and before this suit was begun, defendant deeded the property in controversy to one Ora Cox Wilson of Lincoln, Nebraska. This was simply for convenience, the grantee stating "she wanted me to keep in touch with it;" "to look after her property." "She was in Kansas and I was here and I could look after it better than she could."

With reference to the final execution of the deeds in question, the testimony was as follows: Berry, the notary, Mrs. Allen and defendant were the only persons present. Berry testified: "When I asked him if he understood what he was signing he said he did. He made some remark about not knowing why he had to do it for protection, but I didn't pay any attention." The deed was signed by mark with his left hand. "He could not use his right hand." I acted at the request of Mrs. Allen; Mr. Ebert signed of his own will and accord. Mrs. Ebert remained in the other part of the double room.

Loleta Allen testified she was in the real estate business and drew the deeds early in the fall of 1928 at the request of Mrs. Ebert; she signed Henry's name and he made the cross; signed in his bedroom, Mrs. Ebert was in the adjacent room; Henry said he did not know why he had to do it to get protection; that was all that was said, except Berry asked if he acknowledged the deeds. Mrs. Ebert testified that after the deeds were signed Henry handed them to her, saying, "These are yours; have them recorded;" that she had talked with Arley about the deeds before and after they were executed; that she told him what conveyance had been made to her. This is practically all of the pertinent testimony at the time the deed was signed. Mrs. Kepner testified that she was present on October 12 when Henry declined to sign the deeds, and that after the notary had gone she had a conversation with Henry in which he said that he didn't know just what he wanted to do, and Mrs. Ebert told him that she didn't want him to do anything that he did not want to do himself, and he said "that he wanted to fix things for her and didn't see how, but he asked me how we had our property, and how we had things fixed;" that he wanted to avoid probate court proceedings; talked about the laws of different states; that at other conversations he spoke bitterly about court trials and squandering money in litigation.

The execution of the deeds in question, or rather the transfer of the property to defendant, was discussed by

Arley and defendant prior to their execution; defendant testifying that Arley said, "It was all right." Arley's evidence as to this conversation was: "She asked me in regard to the transfer of these deeds, what I thought about it, just a sort of general opinion. I says, 'It looks to me as though it is the right thing to do if you really need it for his care.'" · Also, that they discussed the effect of the transfers in the event of her death before her husband, and that defendant said: "Well, that will automatically revert back to you children then." Also that she said: "In case of his death before it is used for his care and funeral expenses, etc., I will make a proper distribution, avoid the probate court." Mrs. Ebert also testified that in a conversation with her husband "he said that property was to take care of the expenses and to take care of me after he was gone," and that he never said anything different; that he never told her to make any other disposition of the property covered by the deeds after his death, but that the property was to be hers absolutely; he also said that his claim against the Saunders county home should be canceled, and that the children should have that home and the property in Wahoo. Mrs. Gooch testified that at one time Henry said that he had "paid his children for what he thought they had been worth to him in making this farm." It appears in the evidence that Henry paid Erwin $50 a month after he was of age for work on the farm. January 2, 1930, Erwin wrote a letter to defendant asking in what condition his father left his property and inclosed $72 interest on his $1,200 note, promising to pay the remainder shortly. In response to that letter, on January 14, 1930, defendant wrote Erwin as follows:

"After your father had the trip last summer and we all got home safely and things readjusted for his comfort and etc., he seemed so much more contented and satisfied about everything and everybody, which made things a little easier for me to handle and wade through. He did not want a will but wanted you three children to have the

home place free and clear, which means the cancelation of the note or mortgage for $5,000 and the release on my part, of any claim or interest, that the law might give me, if probated.

"In November of 1928 he deeded to me the Dawson county farm and small property in Lincoln, which he wanted me to have to take care of myself, knowing there would be no one to give me the tender care he received during his long illness.

"When I asked him how he would like me to make the final adjustment should I pass out suddenly or not need all of it, he said I could fix it so his share in what was left of his property, go to you three children and the rest for me to dispose of as I felt I wanted to do.

"I'm sure he wanted to be fair with us all and pray that all will be satisfactory with you children.

"I am going to have things put in legal form just as soon now as I can get to it, so you children will get what your father wanted you to have should something overtake me. I intend to carry out his wishes in detail as nearly as it can be done.

"When you find out what is necessary to do, to help clear the 'home place,' so you can have a clear title to it, let me know and I'll be glad to do it. You will need this, should you ever want to make a transfer to any one. There is nothing that needs probating or mixing up with the courts, which always saves a good per cent.

"I'm sure your father had this in mind when he ask to have things done in this way.

"I want you to know, too, that I am and always shall be interested in you all and anxious for your well being and success. I'm sure you will know this as the years go by. Please let Oral read this, too, for it is hard for me to get so much writing done. Hoping this finds you all well and happy again, lovingly.

"Mother."

It is upon this letter that appellants chiefly base their claim of a constructive trust. It is contended that the

letter is in direct conflict with the testimony of defendant that the transfers to her were absolute, especially that paragraph reading as follows: "When I asked him how he would like me to make the final adjustment should I pass out suddenly or not need all of it, he said I could fix it so his share in what was left of his property, go to you three children and the rest for me to dispose of as I felt I wanted to do." This undoubtedly refers to the properties conveyed, but does not appear to us to be inconsistent with her testimony that the deeds were made to her unconditionally. A fair construction would seem to be that the property was given to her for her use and if anything was left she could fix it so his share of what was left would go to the three children. The most that can be made out of this paragraph is that he wished such portion of the property as was not needed by the defendant during her life to go to his children, and trusted her to make such disposition of it.

. This construction is borne out by the language later on where she speaks of "having things put in legal form." What "form" she meant is not disclosed, but it is likely she intended to make a will to the children. If this was her purpose and constitutes a trust for the benefit of the children the time has not yet arrived to enforce the same.

As to the deed to Wilson, a woman as intelligent as defendant would hardly expect such a conveyance would be effective to prevent recovery of the property by the heirs if otherwise entitled. Mrs. Ebert was not asked about this matter, so the only explanation of it is that given by Ora Cox Wilson. It seems to have had the effect, however, of getting notice to defendant of these suits through service on Wilson, which otherwise might have been by publication.

We are strongly persuaded by the evidence that the defendant is a woman of excellent character; that she was very fond of her husband and, especially after his stroke, gave him all the care and attention which a dutiful and affectionate wife would do, the evidence upon this question

being undisputed; that she was most friendly and affectionate in her treatment and consideration of his children and.had a natural appreciation of their claims upon the bounty and estate of their father; that after her husband's seizure she felt the necessity of taking measures with reference to his property which would enable her to minister to him and supply his needs in case his illness would be prolonged, and for which her own financial condition would be inadequate. We are not concerned with the transfer of the securities, except as that transaction may serve as an aid in determining the real nature and purpose of the conveyances in question. With reference to these there seems to have been no attempt on her part to conceal the transaction from the plaintiffs. She wrote to Erwin for the papers so she could get the description of the Dawson county farm and the Lincoln lot. She talked the matter over with Arley before the deeds were signed, and had the deeds recorded within a month thereafter. If she had procured the deeds secretly and withheld them from record until after the death of her husband, a quite different aspect of the transaction might be presented. Her frank avowal of the desire of her husband that the children should have the Saunders county property free from her husband's $5,000 claim against it is another indication of her recognition of their proper claims. If she had been a woman of the character sought to be painted by the plaintiffs, it is quite probable she would not only have insisted upon retaining the property she received, but would also have claimed her interest in the remainder of her husband's estate.

While there is evidence which, considered alone, would warrant an inference that defendant made use of the situation to persuade her husband to execute the deeds, the evidence as a whole falls far short of establishing such undue influence as to overcome the will and judgment of the grantor. That he was desirous of making some provision for his wife during his lifetime is indicated by the document subsequently executed, called a "will," which seems to ratify his previous transfer of his securities and

of the Lincoln property. The fact that, at that time, he desired the Dawson county farm to descend according to statute indicates a change of mind, but carries no implication derogatory to the validity of his former decision.

We are unable to conclude from the evidence that the transfer of the securities and real estate to defendant was of such an unnatural character as to stamp it fraudulent. The values of the respective parcels of real estate are not disclosed by the evidence. The most we have is, on the one side, $7,500 in securities, the Lincoln lot and the Dawson county farm, and, on the other side, a third interest in the Saunders county farm, a house and lot in Wahoo, a claim for $5,000 and accrued interest from 1924, and the distributive share of the widow in that property. When we consider the financial situation of the husband and wife, the husband's physical condition resulting from a stroke of paralysis, and the uncertainty of the duration of his disability, which in fact continued, with a few intervals, for more than a year, we are driven to the conclusion that, though the provision for his wife may appear somewhat liberal, the mental condition of the husband being such that he was competent to make it, and the influence of the wife to that end not being of such controlling character as to amount in law to a substitution of her will for that of her husband, we do not feel justified in setting the transaction aside.

With reference to the question of a constructive trust, we are of opinion that the most that can be claimed from the evidence is a promise by defendant that what was not needed for her support during her life should go to the children of her husband. The principles of law governing the determination of these cases are well understood; but, after all, the decision of each case depends upon its particular facts, and while we have read many of the cases cited by the plaintiffs, we do not deem it necessary to enter into a discussion of them.

It follows that the decree of the district court is correct and is

AFFIRMED.